Cite as 2020 Ark. App. 93

# ARKANSAS COURT OF APPEALS
DIVISION I
**No.** CV-19-630

| | |
|---|---|
| SEARS ROEBUCK & CO.; ACE AMERICAN INSURANCE CO.; AND SEDGWICK CMS<br><br>APPELLANTS<br><br>V.<br><br>DALE BROWN<br><br>APPELLEE | **Opinion Delivered:** February 12, 2020<br><br>APPEAL FROM THE ARKANSAS WORKERS' COMPENSATION COMMISSION<br>[NO. G600518]<br><br><br><br>AFFIRMED |

## RITA W. GRUBER, Chief Judge

Appellant Sears Roebuck & Co. and its insurers appeal a decision of the Arkansas Workers' Compensation Commission (Commission) awarding benefits to appellee Dale Brown arising out of a motor vehicle accident. On appeal, appellants argue that the Commission's decision is not supported by substantial evidence. Specifically, they argue that (1) there is no substantial evidence to support Brown's claim that the driver of the other vehicle was traveling thirty miles an hour at the time of the accident, and (2) the medical evidence on which the Commission relied is speculative and cannot be substantial evidence. We affirm.

Dale Brown began working for Sears in February 2015 as a residential-appliance-repair technician. On May 11, 2015, he was in an accident while driving the company van from one job to another. At the hearing before the administrative law judge (ALJ), Brown testified that he was rear-ended while stopped at a red light. According to the accident

report, he gave the same account. The other driver, Lavonda Douglas, reported to police that she was at a complete stop when Brown backed into her and gave the name and phone number of a witness who was behind her who allegedly told Douglas that she saw Brown's van backing up. Douglas provided the same account in an affidavit introduced at the hearing.

Brown testified that when the impact occurred, it threw his body forward and hurt his neck. He explained that his left arm or hand was positioned on the steering wheel at the time of the accident. He stated that Douglas was traveling approximately thirty-five miles an hour when she hit him. He denied that he was moving at the time of the accident. Shortly after the accident occurred, he reported it to his supervisor, the insurance company, and the company from whom the van was leased.

Brown went to see his family physician, Dr. Gill Pillow, on May 14, 2015, three days after the accident. He complained of neck and back pain as well as shoulder stiffness. Dr. Pillow continued to see Brown over the following months and ordered an MRI without contrast of his cervical, thoracic, and lumbar spine, which took place on November 17 or 18, 2015. Based on the MRI results, Dr. Pillow took Brown off work on November 20, 2015, until he could be seen by a neurosurgeon because the MRI showed "extensive pathology, including bleeding around the spinal cord." Brown was seen by a neurosurgeon, Dr. David Connor, on December 16, 2015. Dr. Connor's notes reflect that Brown gave a history of sudden onset back and neck pain following the accident seven months earlier. His assessment was cervical spondylosis and radiculopathy with an impression of C5-6 central/left paracentral disc protrusion and C6-7 broad disc protrusion with left greater than right foraminal narrowing; lumbosacral spondylosis with radiculopathy with an impression

of L3-L5 spondylosis with foraminal narrowing; and thoracic cyst with an impression of T4-T7 central myelomalacia with T6-7 dorsal cyst/compression. An MRI with and without contrast was taken in February 2016 and showed "anteriorly displaced and compressed thoracic cord at the T6 level, likely secondary to a posterior spinal arachnoid cyst with associated edema/ischemia in the immediately adjacent thoracic cord from T4-5 down to T6 level."

Dr. Rommell Childress, an orthopedic surgeon, performed an independent medical exam (IME) in April 2016. His notes indicate that Brown was involved in an accident in which he was rear-ended by another vehicle going an "estimated 30 mph or so." When asked if the spinal hemorrhage noted in the November 2015 MRI is causally related to the May 2015 injury, Dr. Childress responded:

> It appears that the trauma of the MVA [motor vehicle accident] is the thing that has precipitated this. However, without an MRI scan documenting the status of the spine prior to the injury, the question could not be answered definitively. However, with the history of injury that the patient had, the assumption is that the hemorrhage is the result of the trauma. I would depend on a Neuro Surgeon, to give [a] definitive answer regarding this, but the assumption is that with the trauma and the evidence of cord contusion and hemorrhage, the MVA is the source of this type of acute finding.

Dr. Childress concluded that Brown should continue to see the neurosurgeon, should not work until released by the neurosurgeon, and had not reached maximum medical improvement.

Brown returned to Dr. Connor on April 6 and June 1, 2016. After the June visit, Dr. Connor noted that Brown had returned after conservative measures of muscle relaxers and physical therapy had not relieved his neck pain. In his notes, Dr. Connor wrote that Brown "requests surgical correction and I have discussed the risks and benefits of a C5-6,

3

C6-7 anterior cervical discectomy and fusion. He has agreed to undergo this procedure on 7/1/16."

On June 10, Dr. Wayne Bruffett conducted an IME at appellants' request. His assessment of Brown was "degenerative disease cervical spine abnormal MRI scan chronic without upper neuron signs degenerative disc disease lumbar spine." Dr. Bruffett did not see objective medical evidence supporting injury to Brown's cervical spine. He could not say to a reasonable degree of medical certainty that degenerative changes were exacerbated due to the accident. He noted that Brown stated he was having surgery because of "whiplash," and although he did not have the surgeon's latest note, he did not feel that it was an "objective injury to the cervical spine" as a result of this accident. He also did not see objective medical evidence to support an injury to the thoracic spine, stating within a reasonable degree of medical certainty that "based on the mechanism of injury this accident did not cause an objective injury to the thoracic spine." According to Brown's testimony, Dr. Bruffett had pictures of the wrecked vehicles in the examination room. Brown said the van in the picture was not in the same condition as he remembered after the accident. Because he is not a shoulder specialist, Dr. Bruffett did not form an opinion as to Brown's shoulder. Ultimately, Dr. Bruffett thought Brown had reached maximum medical improvement.

Dr. Connor performed the anterior cervical discectomy and fusion surgery on July 1, 2016, and ordered that Brown remain off work until August 15, 2016, when he could return with restrictions. At an August 10, 2016, follow-up appointment, Dr. Connor noted that Brown was "progressing quite nicely" but continued to complain of left-shoulder pain

and limited range of motion. Brown saw Dr. Pillow on August 17, 2016, for his left-shoulder injury. An MRI was ordered; it showed partial thickness and articular surface tearing at the posterior supraspinatus tendon. Brown was referred to Dr. William Hefley.

On September 14, 2016, Brown was seen by Dr. Hefley, who treated him with a steroid injection and prescribed physical therapy, noting that without improvement, the shoulder injury would require surgery. On October 21, 2016, Brown returned to Dr. Hefley, who told him that if he was improving, he could return to work. If he was not improving, Dr. Hefley thought there was enough pathology to require arthroscopy for debridement or even possible repair. The note provided that Brown had to go back to work for financial reasons. Brown was directed to continue his exercises on his own and to return if he was unable to perform his duties or felt unsafe, at which point surgery would be considered.

Brown returned to Dr. Hefley on September 27, 2017, for continued shoulder pain since the accident. A left-shoulder arthroscopy was performed on December 14, 2017. It revealed a rotator-cuff tear, SLAP tear, and anterior/inferior labral tear, which were repaired. Dr. Hefley's January 3, 2018, chart note provides that Brown called requesting clarification that his left-arm surgery was secondary to the accident. The note stated that Brown reported no prior problems with his shoulder and began having problems after the accident. Dr. Hefley "fe[lt] the MVA is the cause of his shoulder pathology."

Appellants requested that Dr. Kirk Reynolds review Brown's claim of injury to his left shoulder. Upon review of only the records, he opined that Brown's left-shoulder pain and pathology were not causally related to the accident. He noted the inaccuracy of Dr.

Hefley's January 3, 2018, chart note indicating that Brown had no prior complaints of shoulder pain because Dr. Pillow's May 25, 2011, records show Brown had been seen for bilateral shoulder pain.

Although the parties stipulated that Brown sustained compensable injuries in the accident, they agreed that the issues to be litigated at the hearing before the ALJ included "compensability (causal relationship)." The ALJ found that Brown's cervical–spine and left–shoulder injuries were compensable as a result of the accident but that Brown did not meet his burden of proof that he sustained an injury to his lumbar spine. Appellants appealed, and the Commission affirmed the decision of the ALJ in its own opinion. Appellants filed a timely notice of appeal.

In reviewing decisions of the Commission, we view the evidence and all reasonable inferences deducible therefrom in the light most favorable to the Commission's findings, and we affirm if the decision is supported by substantial evidence. *La-Z-Boy Mfg., Inc. v. Bruner,* 2016 Ark. App. 117, at 5, 484 S.W.3d 700, 703. Substantial evidence exists if reasonable minds could reach the Commission's conclusion. *Get Rid of It Ark. v. Graham,* 2016 Ark. App. 88, at 10. We will not reverse the Commission's decision unless fair-minded persons with the same facts before them could not have reached the Commission's conclusions. *Id.* The issue is not whether we might have reached a different result or whether the evidence would have supported a contrary finding. *Id.* Furthermore, we are bound by the Commission's determinations on issues of credibility. *Pina v. Wal-Mart Stores, Inc.,* 91 Ark. App. 77, 83, 208 S.W.3d 236, 239 (2005).

To prove the occurrence of a specific-incident compensable injury, the claimant must establish by a preponderance of the evidence (1) that an injury occurred arising out of and in the scope of employment; (2) that the injury caused internal or external harm to the body that required medical services or resulted in disability or death; (3) that the injury is established by medical evidence supported by objective findings, as defined in Ark. Code Ann. § 11-9-102(16); and (4) that the injury was caused by a specific incident and is identifiable by time and place of occurrence. Ark. Code Ann. § 11-9-102(4)(A)(i)–(ii) (Repl. 2012).

First, appellants argue that there is no substantial evidence to support Brown's claim that the driver of the other vehicle was traveling thirty miles an hour at the time of the accident. They contend that Brown's testimony about the speed of the accident was "nothing but speculation."

The Commission noted the two drivers involved in the accident could not have had more different versions of the accident—Brown claimed he was rear-ended while stopped, and Douglas stated that Brown suddenly backed into her while at the stop light. Douglas, in her affidavit, indicated that a witness behind her saw Brown's reverse lights come on just before the accident and that she provided the witness's name and phone number on the police report. The Commission noted that there was nothing in the record to indicate whether anyone attempted to contact the witness or whose version the witness would have corroborated. In addition, the Commission noted that it was undisputed that the work van had approximately $2000 in damage to the bumper and that there did not appear to be much damage to the other vehicle.

The Commission wrote,

> Although it was clear that either Claimant or the other driver was lying, there is no independent evidence in the record to suggest which driver was lying. Perhaps testimony, rather than an affidavit, of the other driver and testimony or even an affidavit, of the other witness would have helped flesh out this matter. Without more, we find the objective medical evidence supports Claimant's version of the wreck and the opinions of Claimant's treating physicians.

Contrary to appellants' contention, this issue is one of credibility and weight to be accorded to the evidence. Our case law on this issue is clear. Credibility of witnesses is properly the province of the Commission, which had the benefit of the witnesses' presence to judge their demeanor and determine the weight to be accorded their statements. *Gansky v. Hi-Tech Engineering*, 325 Ark. 163, 924 S.W.2d 790 (1996). It is the Commission, not this court, that resolves contradictions, determines the credibility of witnesses, and weighs the evidence. *Marten Transp., Ltd. v. Morgan*, 2017 Ark. App. 608, 532 S.W.3d 139. It is not a matter of whether we would have reached a different conclusion but whether reasonable minds could reach the Commission's conclusions. *Get Rid of It Ark.*, 2016 Ark. App. 88, at 10. We find no error by the Commission.

For their second point, appellants contend that the medical evidence on which the Commission relied is also speculative and cannot be substantial evidence. This argument is related to their first argument. They suggest that because the physicians relied on Brown's speculative version of Douglas's speed, the medical opinions based thereon are also speculative and thus cannot be substantial evidence. Stated another way, appellants, citing *Wirth v. Reynolds Metal Co.*, 58 Ark. App. 161, 167, 947 S.W.2d 401, 404 (1997), state that the physicians engaged in the "logical fallacy known as *post hoc ergo propter hoc*, meaning 'after this and therefore because of this.'" They explain that the physicians attribute Brown's

condition to the accident because he complained of pain after the accident but offer no objective findings in support of that conclusion—only the sequence of events—and contend that such reasoning cannot establish causation.

Appellants contend that speculation is not substantial evidence sufficient to support a Commission ruling, citing *Arkansas Department of Correction v. Glover*, 35 Ark. App. 32, 812 S.W.2d 692 (1991). Their reliance on *Glover* is misplaced. The issue there was whether the employee was performing employment services at the time of his death. There was evidence that when Glover finished his shift, a superior asked him to help with an errand. There was no indication that the errand was related to work, but instead the two men rode around drinking beer. In reversing the Commission's decision, we stated there was no substantial evidence to support a finding that Glover felt obligated to assist a superior ranking officer. "Such a finding would be based on conjecture and speculation. Conjecture and speculation, even if plausible, cannot take the place of proof. *Dena Constr. Co. v. Herndon*, 264 Ark. 791, 575 S.W.2d 155 (1979)." *Glover*, 35 Ark. App. at 36–37, 812 S.W.2d at 695. Here, there was a stipulation that Brown sustained compensable injuries.

While appellants challenge the medical evidence in support of causation, it should be mentioned that objective medical evidence is necessary to establish the existence and extent of an injury but not essential to establish the causal relationship between the injury and a work-related accident. *Wal-Mart Stores, Inc. v. VanWagner*, 337 Ark. 443, 447, 990 S.W.2d 522, 524 (1999) (adopting this court's holding in *Stephens Truck Lines v. Millican*, 58 Ark. App. 275, 950 S.W.2d 472 (1997)). Our supreme court stated:

> The plethora of possible causes for work-related injuries includes many that can be established by common-sense observation and deduction. To require medical proof

of causation in every case appears out of line with the general policy of economy and efficiency contained within the workers' compensation law. To be sure, there will be circumstances where medical evidence will be necessary to establish that a particular injury resulted from a work-related incident but not in every case.

In *VanWagner*, the supreme court went on to explain that adopting the *Millican* holding did not completely resolve the case. It meant only that VanWagner need not produce objective medical evidence that the fall she said occurred caused her injury where objective medical evidence established the injury's existence, and a preponderance of other nonmedical evidence established a causal relation to a work-related incident. The question became whether VanWagner met her burden. The supreme court acknowledged that the principal evidence of causation for VanWagner's injury consisted of her own testimony.

> She testified regarding the fall, reporting it to her supervisor, seeking medical attention and that others present witnessed it. She also offered some physician testimony recorded months later which was at best inconclusive. Appellant countered this evidence with the testimony of appellee's supervisor who could not remember the incident and with physicians' statements in which the physicians were unwilling to state a causal connection between the alleged fall and appellee's medical condition. This case then resolves down to a matter of credibility. Was the claimant's story believable?

*VanWagner*, 337 Ark. at 447, 990 S.W.2d at 525. Whether VanWagner met her burden of proving causation turned on credibility, which was a matter for the Commission to determine. Further, the Commission may reject a doctor's opinion as to causation when it is based on a history from the claimant that the Commission has determined is not credible. *Davis v. Remington Arms Co.*, 2018 Ark. App. 390, at 7, 557 S.W.3d 894, 900 (citing *Roberts v. Whirlpool*, 102 Ark. App. 284, 289, 284 S.W.3d 100, 103 (2008)). The Commission did not do so in this case.

In sum, appellants are requesting that we make contrary credibility determinations and reweigh the evidence in this case. Although our court may have made different findings, it is the Commission's duty rather than ours to make credibility determinations, to weigh the evidence, and to resolve conflicts in medical opinions, evidence, and testimony. *See Ark. Dep't of Transp. v. Abercrombie*, 2019 Ark. App. 372, at 13, 584 S.W.3d 701, 710. We hold that substantial evidence supports the Commission's decision.

Affirmed.

ABRAMSON and MURPHY, JJ., agree.

*Wright, Lindsey & Jennings LLP*, by: *Lee J. Muldrow* and *Gary D. Marts, Jr.*, for appellants.

*Hunter Law Firm, P.A.*, by: *Scott Hunter, Jr.*, for appellee.